Mr. Thomas, whenever you're ready. May it please the court, Bruce Thomas on behalf the plaintiff, appellants, the estate and family of Rhonda Newsom. About 50 years ago the United States Supreme Court in the Steele v. Gamble gave us a warning. They said that because prisoners are so beholden to prison officials to provide for their medical needs that when that duty is not met, a prisoner could suffer effectively torture or slow lingering death. And that's exactly what occurred here in Anderson County, Texas for 97 days in Rhonda Newsom. There were three distinct periods of deliberate indifference to Rhonda Newsom's Addison's disease. There was during the entire first, during the entire incarceration, she was never treated for her Addison's disease. That secondly, inevitably led to an Addisonian crisis for which she never received emergency medical care. And they delay and do not timely attempt resuscitation. I'd like to address each of those three periods in some more detail and emphasize some of the facts which should have raised the fact issue to defeat summary judgment, which unfortunately the district court effectively assumed away because it treat Rhonda's Addison's disease is in fact undisputed. It's undisputed Rhonda had Addison's disease, that Addison's disease is deadly if not treated. Is it disputed though whether the jailer defendants knew that she had Addison's disease or that the symptoms that she was exhibiting in those final moments were indications of some Addisonian crisis, as you put it? It's undisputed she had it. Did they know she had it? And did they know the import of the symptoms that she was exhibiting? Certainly, certainly the medical defendants did. And certainly the chief jailer knew that he had, that she had this condition because he referenced it when he spilled the beans about seeking a PR bond. What about the, what about the other jailer defendants? Any record of evidence they had that awareness? We don't know for certain to what extent they had, uh, uh, access to, to the medical records, but with respect to them, our argument is that evidence clearly raises, uh, issue of fact that Rhonda was in grave distress and they had an independent duty to respond to that grave distress for whatever happened to be the cause of it. With respect to Corlene Green, we have a prima facie evidence, a prima facie case of deliberate indifference just from the fact that they never treated Rhonda for Addison's disease during the 97 days of incarceration. They can't claim that they didn't know she needed treatment because after all, even though we disputed, they claimed that they had developed an oral plan, uh, that they never committed to writing, that they never implemented, but nonetheless claimed they had a plan to treat her. So if they had a plan, if they claimed to have a plan to treat her, just to make that claim shows that they knew that she needed to be treated for Addison's disease. And any medical professional would know that it's just like, it's very similar to a type one diabetes. If you don't treat a type one diabetes with a patient that needs insulin, they're eventually going to go into a crisis. It's a very similar disease, a gland disease where you don't, uh, uh, develop, the body can't create hormones and you have to control that with steroids or it's going to develop into a crisis. As threat to her health and they failed to respond to that threat, uh, by taking reasonable measures to abate it. In fact, they took no measures to abate it. And because they, they know they can't say that they treated her, all they can do is come back with excuses. But whether they having excuses doesn't, doesn't mean they have a defense. Their big excuse is, well, we were going to treat her, but we couldn't get her personal, her medical records from her personal doctor. But there's absolutely, we dispute that they even tried. But even if you credit that, there's absolutely no authority that a jail can indefinitely withhold medical care to detainee because they can't get the medical records from her previous, uh, positions. She had Addison's disease. The jailers knew, knew she had it. Well, she reported whether the people in charge were aware or unaware. They were aware she had Addison's disease. People in charge of the jail were certainly aware she had Addison's disease and she disclosed it on her intake file. So the jailers would ordinarily have access to that intake file where she disclosed not only Addison's disease, but several of preexisting conditions and in some detail, all the medications that she was taking. And her medication list shows that she never received any medication during the 97 days she was in jail for, for, uh, for Addison's disease. All that she got were some over-the-counter medications like gas X, uh, for the bloating that Addison's disease was causing. And that's, that's like prescribing cough drops for lung cancer. It has absolutely no effect on Addison's disease and it's not going to prevent it from developing into a full-blown crisis. They had no more right to withhold treatment for Addison's disease because they allegedly couldn't get her records from a prior doctor. Then they would have had to withhold insulin from a diabetes patient. Let me ask you about what the record shows about, A, what they knew about her disease and whether they had, whether they evidenced any sense of responsibility for dealing with it. You don't have to die of Addison's disease, okay? But it does have to be part of your plan. You have to have a way to deal with it. And when you've got someone who's in a jail, um, they have to have an awareness, I would think, on the record somewhere that they were aware of what their responsibility was. Is that in this record? Well, I think it is, Your Honor, because, because they just, she disclosed on her anymore to testify, but that's effectively a request. I have Addison's disease. Treat me for it. They recognized that she had Addison's disease. Dr. Corley, on the one time he saw her, wrote down in his notes, she has Addison's disease and I need to follow up about her personal records. And they claim that the health services plan that they were operating under requires that they provide conditions for each detainee. That's a matter of state law under the Senator Bland Act in Texas. And they're supposed to document that in the detainee's file. Now, they never documented anything, but their claim to this court has been, well, we were going to do it. We just didn't do it. Green says in his deposition, in the deposition testimony, that they discussed the medical history and that there was supposed to be some sort of plan put in place. Yes, he's, he claimed that there, that they had, he had orally discussed it with Corley and that they were going to continue the same treatment plan as our physician had. And that's why they needed her medical records. But that doesn't justify doing nothing for 97 days to treat it because they allegedly were having trouble. If they really were having trouble getting her medical records, which we don't believe, because if they were having trouble, they would have documented it in her medical file. And they never did. What if they don't, they understood that they needed to have her medical records, and they understood she had Addison's disease. So that's two strong factors that indicate that they were aware of what their responsibilities were. Yes. What did they do on this record? They did nothing to manage her Addison's disease. They just allowed it to develop into a full-blown crisis. And the excuse they offer is, well, we never got her medical records. But here there was a, if they didn't, if they were really having trouble, they had to ease it out. Because remember, this is a part-time gig for Corley and Green. They had full-time jobs at the local emergency room hospital, where Ron Newsom was a frequent player. In fact, in Green's words, everybody in the emergency room knew Rhonda Newsom because she had been there so often. So if they really were having trouble, they could have easily gotten the records from the hospital. The standard isn't malpractice. It's not a malpractice standard. It's not a negligent standard. It's a deliberate and different standard. And even though you can say now, well, Nurse Green really should have put two and two together, that's different than saying Nurse Green had subjective knowledge. Isn't it? No, because it's a known risk. That's exactly what the court was talking about in the Spikes versus McVeigh case that I cited in the reply. They know she has Addison's disease. They know it's a known risk. They are seeing the having, again, having a diabetes patient that's been deprived of insulin. And then the doctors say, well, never considered that it might be insulin deprivation that was causing this. Well, of course it is. That's the only reasonable conclusion that she's becoming progressively worse because she's got a potentially deadly disease that's not being treated. With respect to the, moving on to the crisis itself, we have a number of facts during the crisis that put the jailers on notice of just how serious it was. Rhonda, leading up to those days, June 14th and 15th, she's asking to be treated by a doctor. She specifically goes to Jailer Wilson, asked to be  a doctor for abdominal pain. Jailer Wilson doesn't do anything in response. Even earlier, she's complaining she thinks she's having a heart attack. They don't do anything in response. They don't let her see a doctor. Has she asked to go to the hospital? I think so. She asked to see a doctor, Jailer Wilson. And shortly afterwards, she was certainly asking to go to the hospital. She was screaming it out all night and all the next day. Let me see a doctor. Oh, please help me. Take me to the hospital. Now, Green, this is where there's disputed evidence. Green says that when he showed up at about 730 on the morning of June 15th, she said she didn't want to go to the hospital. Well, that's a disputed issue. In fact, that's completely opposite of what all the detainees say that she had been screaming out for hours before and afterwards to believe that during the four minutes that he saw her, she suddenly changed his mind. Just is completely incredible. And furthermore, he's supposed to document in the file if there's a refusal of medical treatment. And he doesn't document in the file that there's any refusal of medical treatment. Sergeant Jones takes blood pressure reading about two o'clock. That's a reading of 80 over 40. Alarmingly low. Anybody would know that's a problem. There are initial intake file shows that she came in with a blood pressure reading of 120 over 67. So something is very obviously wrong. The trustee that's assigned to herself observes that she's throwing up, throwing up a black substance that can readily be identified as blood. She's doing that all night. The other detainees in the area hear her screaming out all night, asking for help all the next day. She's supposed to be on medical watch. So the jailers who are supposed to be watching her that are milling around going in and out of her cell, looking into her cell, are able to see the exact same thing that the trustee sees. They're able to hear the same thing. So there's evidence that Jones, Strong, Carpenter, Wickersham, Hughes, Wesson and Pearson all were in the area and were able to hear the same thing and see the same thing that was reported by the others and did nothing to intervene. Let me let me jump back to nurse Green real fast. So what is the best record evidence? Um, to underscore that the critical values that came back from that underlying blood test put nurse Green on notice that Newsom needed immediate emergency care. Best evidence is his own testimony that he would never sit on those values. Trust me, believe me, combined with the record that shows that he was indeed given those values and that nurse Green said, I would always immediately report these critical values to Dr. Corley. Well, we assert that that's exactly what happened and he's simply lying about it because it's again, it's completely incredible to believe that this technician went to all the trouble of tracking him down and reporting the test results to him and reported all the test results except the two critical values that say that she's about to die. And he immediately calls and Corley immediately calls Jailer Schulte, the chief jailer, after he gets this information. We don't know what they said and we don't know what they said. All these texts that disappeared, but it's a pretty reasonable assumption that he's reporting. Quick procedural question. Um, just assuming argue and no, we agree with you that the district court should have allowed you to add the allegations about the PR bond policy. Would you have sought any additional discovery? Different discovery? Did discovery you already had already adequately cover that topic? No, we are. We covered it, but not adequately. In our opinion, we are always seeking additional evidence. The court very narrowly tailored our this case. Okay, we can't challenge everything for our brief, so we don't have a point of error on that. But that's my response. All right, we'll see you back on rebuttal and a few. So my notes show that there are. Here we go. That there are three council on Apple East side, but I only see two at the table. Okay. All right. Y'all want to stick with your allotted how you've allotted your time? All right, Mr Davis, you're up first with seven minutes. Your Honor, um, in this case, I think it's really important to distinguish what's in the record in this case from what is merely just argument because the two from the last argument differ substantially. There is no evidence that Captain Cho either knew about Addison's disease or appreciated what Addison's disease was. Until this case, I didn't know what Addison's disease was. Does he have to? If the symptoms were grave enough that she was throwing up blood or or in a number of the other symptoms that were here today, does does the disease have to have a name on it? Or is that standing alone grave enough to call some attention? I don't think so, Your Honor. I think what's really required in a situation like this is that deliberate indifference to take effect. You have to not only know the situation that's existing in the disease that is existing, but you have to realize that it's a disease, a disease that can cause serious injury or death. And then you have to engage in conduct that is deliberately indifferent, that you know what's gonna happen, and you just don't do anything about it. And that's not anything that they've established that Captain Cho did remotely. Didn't she say maybe I'm completely off base on this, but I had the idea that when she checked into the jail, which is that she said she had Addison's disease. I mean, they didn't. You don't claim that they didn't understand that she had Addison's disease. No, ma'am. So when an inmate checks into the jail, they list everything that's wrong with them. As a general rule, at least you hope they do. And in her case, she indicated everything that she had, from Addison's disease to her back problems to everything else, and then listed all the medications that she was on that her previous doctor had put her on. And they continued her on all those medications throughout the time period that she was there in the jail. And she received it. It's not that we didn't know she had Addison's disease. You your client understood that she had Addison's disease and apparently knew what it was. I mean, it's not rocket science. Your Honor, the nurse and the doctor may have understood what Addison's disease was. Captain Cho does not. He's not gonna see what Addison's. He's not gonna know what Addison's disease is, and he's not gonna see the intake and jail staff are not. What does the people who are responsible like the doctor or nurse the nurse understood she had Addison's disease knew that? What good does that do her? What good does that do? Miss Newsome, the victim here? Yes, because those are people contracted to perform medical services for the jail and inform the jail and the sheriff and the jail administrator what those medical situations are. None of those people. The sheriff's not a medical person. The chief's not a medical person. The captain's not a medical person. Jailers aren't telling me that they didn't know she had Addison's disease. I thought I thought some of the people in charge there knew she had Addison's disease. There's nothing in the record to indicate, and I know it was just stated. Captain Cho knew that she had said she had it. Uh, that's in her intake form. But those intake forms don't go up to the jail administrator. Oh, good. Well, though, so you're defending that. I take it. Yes, ma'am. There's no way a jail administrator could see every medical intake form that comes into the jail. Those medical intake forms go to the nursing staff of the doctors. They go to the medical people. So your answer is that although she reported when she checked in or brought in that she had Addison's disease, that there was no responsibility that the people in the system who were responsible for her, there is no requirement that they had to know that they there's no requirement that they have to be reported certain things. But it goes to medical staff, and the medical staff is trained and licensed and certified. It goes to the medical staff. The medical staff makes decisions through consulting with the sheriff and everybody else. But it's the medical staff, the medical professionals that have to make those medical decisions. So you're telling so the outcome of this of your argument is that the medical staff may have known she had Addison's disease because she said so told him she had it, but nobody else did. So no problem. Well, HIPAA doesn't allow jailers to see an inmate's medical file. She may fill it out on intake, but the only people that are going to see that intake form are the intake people and medical staff. And if somebody comes in and says they have AIDS, you can't let the rank and file jailers see that. They're not allowed to see that. HIPAA disallows that. You may know that somebody is ill, and if it's necessary as a jailer, somebody may tell you how to treat them. But let's say that I want to focus on Hughes and Carpenter and Wickersham. Okay. So you say they did not know she had Addison's disease. They knew that she was not feeling well or they believed that she was not feeling well. But they saw her collapse. They saw her vomit and then left her for about 30 minutes, during which time she became non-responsive. So how are those, whether they knew she had Addison's disease or not, how are those symptoms? In the last hours before her death, how are they not obvious signs of a medical emergency? Your Honor, what they saw, so she had mobility problems, correct? And what the evidence says, she had back problems, she had leg problems, she had problems getting around. When they went in to see her, Wickersham heard her asking her in the bathroom, and she said, I need to go right now. And he said, holler if you do need to go. She did. They went in, Wickersham and Carpenter took her to the bathroom. Actually, there were three of them that took her to the bathroom. Wickersham... I don't understand where you're going with this argument. And it would be, I guess maybe I'm bound to find out. Yes, ma'am. I'll try to help you. The fact that she had Addison's disease, which she reported when she checked in, that these other people that were sort of in charge didn't know she had it, or at least didn't understand the significance of it. They're going to know that she's ill and that she's sick? The question is, did they know? She reported, I think, when she signed in, or whatever you do when you get there. You fill out a list of things. She said she had Addison's disease. So they, if you've got a check-in form where you report that they want you to fill out and you put down that you have Addison's disease, is it your position that your client had no responsibility for that information, even though they had it? Your Honor, if that, so it has to go to a medical person. A sheriff is not a medical person. That would be like that and I would see Addison's disease and I would have absolutely no idea what Addison's disease was. Your client, as I understand it, does not take the position that they never understood the significance of Addison's disease, of her reporting she had it. Your Honor, they knew that she was ill, but you're trying to, getting a die from Addison's disease, okay? Her death was absolutely not ordained, not required, not going to happen regardless, okay? You don't die from Addison's disease. If somebody knows you have it and they do the minimum required to treat it, not make it worse, that's it. So all this happened on your client's watch and your position is your client is not responsible? Yes, ma'am. My position is my client is not responsible. My client has to have knowledge. You know, when she had the disease. Your Honor, you cannot impute medical knowledge at an expert level to somebody just because they're a licensed peace officer or a licensed jailer. I thought there was no doctor involved in all this. There is a doctor. You wouldn't pay in the doctor? Your Honor, there is a doctor involved in this and that doctor is represented. I represent the county defendant. I represent the sheriff. You represented the employer of the doctor, right? No, ma'am. The doctor was not free. Who paid him? Ma'am, the doctor was a contract physician. I represent the county and the sheriff and the individuals. It was the county, right? Yes, ma'am. The county had a contract with the doctor. He's your doctor. He is a contracted doctor for the county. But you're trying to impute knowledge on behalf of a contract physician to the sheriff or to a jailer. The reason that you have doctors and nurses, if the sheriff and the chief jailer and all the jailers, if they knew how to treat these people, then why would you why would you bother to have doctors and nurses? What the problem you've got and you're well aware of it is this woman died and that was not necessary. It was not ordained. She was not going to die of Addison's disease if it was properly paid attention to. And it didn't take a rocket scientist. OK, Your Honor, how is the sheriff going to know about Addison's disease? How is the chief jailer and how are the jailers going to know? Your answer is even though she filled it out on the form that she had Addison's disease when she was checked in there, that they didn't know and they didn't that they just didn't know. The jail medical staff would know, Your Honor, the jail medical staff would know. They knew that she was ill. But as to them knowing that she had Addison's disease, not just that she was ill, but that she collapsed and vomited and they left for half an hour and they came back and then she's non responsive. And how how are those symptoms not evidence of a urgent medical emergency? Your Honor, so what they knew, and you can tell this from the record, and I suggest, you know, you read the record and I know I didn't mean that really, but the interpretations of the record are, I think, pretty loose in this case. Did you have one more question? I don't. I just I guess I don't think it matters that they whether or not they knew that she had Addison's disease. I agree with Judge Willett that the symptoms were grave in and of themselves, regardless of whether or not your jailers knew what name to put on what those symptoms were. Okay, so the symptoms. We're going to have this be your final wrap up comment. So the symptoms, Your Honor, that the jailers knew about, she wanted to go to the bathroom. They helped her up. They got her into the wheelchair. She got herself on the commode. She was able to pull her pants down, get on the commode herself. She was throwing up blood, dried blood. Your Honor, she threw up black. She threw up black. How does a jailer know that black is blood? I mean, if you throw up bright red blood and you smell it, you know it. If you throw up black, something that's black, depending on what you've eaten. Your clients, bless their hearts, did not take care of this woman with basic care that she deserved. Your Honor, the plaintiff has not shown that any of these people knew, any of my jailers knew, that she was seriously ill. And that's what's required. They have to show and they have to prove deliberate indifference. They can't prove medical negligence or medical malpractice. Or they can't prove, it's not even good to prove that these people didn't do the most intelligent thing. Or they were negligent. They've got to prove that they knew this lady was going to die and they just didn't care. All right, Mr. Davis, thank you so much. Thank you, Your Honor. Mr. Iglesias, we're still waiting for your co-counsel to show up. Hopefully we can hear from her, but take it away. Thank you, Judge Willett, and may it please the court. My name is David Iglesias and I represent Nurse Timothy Green. In Gobert v. Caldwell, this court held that deliberate indifference is wholly independent of the optimal standard of care. In this case, the appellants asked this court to disregard that well-established principle. The district court simply did not err in finding that Nurse Green is entitled to qualified immunity for at least two reasons. First, I'll address the fact that there's no evidence in the record that actually shows that Nurse Green was deliberately indifferent to Ms. Newsom's serious medical needs. Second, I'll discuss the fact that Nurse Green would be entitled to qualified immunity even if the record were to show that her constitutional rights had been violated. First, it goes without saying that deliberate indifference is an extremely high standard to meet. In Murphy v. Keller, this court held that it's hornbook law that negligence does not rise to the level of deliberate indifference. And in Gobert, this court went even further and held that medical malpractice, unsuccessful treatment, and negligence don't rise to the level of deliberate indifference. I asked Mr. Thomas when he was first up here about Nurse Green and whether the critical values that were shown meant that Newsom needed immediate medical care. Because the standard, as you just mentioned, is not whether care was substandard, subpar, negligent, whatever. It's not a malpractice standard. It's deliberate indifference. And I said, what's the best evidence to show deliberate indifference here? Subjective awareness and disregard of it. And he said the nurse's own testimony, that he would not have sat on or disregarded a critical value reading like that. Yes, Your Honor, that testimony itself was entirely taken out of context from the deposition that's in the record. Your Honor, Nurse Green testified many, many times in his deposition, which is in the record on pages 1850 through 1935. He testified, I don't know how many times, no less than 10 times that he did not know of those two critical values until 5 o'clock on the afternoon of June the 15th. Was that disputed? No, Your Honor. There's no evidence in the record which would dispute it. Now, the appellants asked the court to make inferences which frankly aren't reasonable, considering the evidence in the record. The evidence in the record shows that Nurse Green took the blood sample to Palestine Regional Medical Center. At some point, he and the lab technician spoke at about 1040 that morning. And while they agree that perhaps they discussed some values, Nurse Green specifically said that he didn't discuss the two critical values that were discussed right then. Also, even if those two critical values were discussed, Nurse Green would be entitled to qualified immunity based on the evidence that's in the record as well. Your Honor, there's no evidence that Nurse Green ever made a subjective connection between the facts that he knew and an excessive risk of harm to Ms. Newsom. There's absolutely no record evidence of that. In fact, the evidence in the record shows quite the opposite. Nurse Green testified in his deposition, which I cited earlier, his words were, I certainly didn't realize how sick she was. I don't think she realized how sick she was. Later on, he told the Texas Rangers specifically, I didn't think she was going to die. Your Honor, there's absolutely no evidence in the record which would show that Nurse Green made that subjective connection between whatever facts he knew, even assuming without conceding that he might have known about those two critical values, even if he did, which again, we don't concede. Your Honor, he still never made that subjective connection between those critical values and an excessive risk of harm to Ms. Newsom. Your Honor, the evidence is replete with medical care that was- He know or she, it's a he, right? Yeah. Yes, ma'am. Did he know that she was throwing up blood? No, ma'am. The evidence shows that he knew that she was vomiting a brown substance, but there's no evidence that he ever made a connection that that could have been blood anywhere in the record. In fact, Mr. Green was never there when she actually threw up blood. He examined her twice in the 18 hours before her death, one on the first time on the evening of June the 14th when he took her vital signs, which were normal. She complained of vomiting, nausea, and pain in her right flank, but also she told Nurse Green that she was able to keep down water. She had eaten chips and could keep those down, and she had also eaten other food and could keep those down as well. The only evidence that we have in the record also shows that he offered for her to go to the hospital, and she declined. Your Honors, the discovery in this case went on for no less than 18 months, as I recall, and nowhere did the plaintiffs in the court below ever seek any discovery that would contradict that. That's the only evidence in the record is that she declined to go to the hospital. Your Honor. What is the procedure when you have someone who's an inmate who's extremely sick? She's throwing up black blood at me, and so she says, I don't want to go to the hospital. So what's the official position when you've got an inmate who's throwing up dark blood, and she says, I don't want to go? Does she have a choice? Well, Your Honor, and I'm out of time, if I may. That's okay. Just answer that. Yes, Your Honor. The record is replete with evidence from Nurse Green that jailers can take or can send inmates to the hospital at any time they believe that it's necessary. And so, again, there's no evidence in the record that anybody believed that her vomit contained blood. Certainly, Nurse Green didn't know that. But jailers are permitted to take inmates to the hospital whenever necessary. In conclusion, Your Honor, Ms. Newsom's death was certainly tragic. However, in Sanchez v. Oliver, this court held that perfection is not the standard for jail medical care, but perfection is the standard that the appellants are asking this court to apply. Your Honors, we respectfully ask that the district court affirm the lower court's judgment. Thank you. Thank you, Mr. Iglesias. Mr. Thomas, you're back for four minutes. To the extent it matters, we believe that there's an e-mail that shows that the suicide assessment form that where she disclosed her Addison's disease was circulated to their clients, beyond the medical staff? Yes, because typically a suicide assessment form is done by a jailer, and that's available to the jail. That's not a medical form. And we believe that to be correct, and I will send you a 28-J letter if I have a cite from it. But what we do know for certain, and I know here standing in front of you, is what the evidence shows that Mr. Green told Jacob Mobley was the real reason he didn't send Rhonda to the hospital that day. It was because he said he was being restricted by the sheriff and how many detainees he could send to the hospital. And the sheriff specifically didn't want to send Rhonda to the hospital. And that's the real reason that he didn't send Rhonda to the hospital, not because she said she didn't want to go, not because he didn't know that she needed to go, but because the sheriff's policy was don't send them. Let's try to get a PR bond to release them first. I saw that in the briefs. The idea is let's just get a PR bond and move her on out. That's correct. And that has some very salient benefits to the sheriff who is trying to avoid his obligations under the Constitution to provide medical care for his detainees, particularly in this case where you have a detainee on the brink of death and you think they may well die on your watch. If you can get that order that releases them from the jail before they die, then you don't have to file a custodial death report with the attorney general of Texas because it wasn't a custodial death. There's not an automatic autopsy that shows the cause of death. There's not an automatic investigation from the Texas Rangers to determine if there is criminal activity. And there's no because there's none of this. There's no paper record for which Section 1983 plaintiff's lawyers can look at. Mr. Mr. Iglesias says that looking at Nurse Green's testimony, kind of cohesively, contextually, that Nurse Green testified that he did not know of those critical values until later. Right when she died, five o'clock of all the miraculous coincidences, he learned about the critical values right when he learned that she died. Just a little bit too much to swallow. But the record actually shows that he was told the critical values, that they have a procedure to report critical values to someone who can take action on them. And that, as discussed in the Texas Rangers report and interviews, that with the technician that he called Nurse Green for that specific reason to do what they call a readback, where they have the person they're talking to say back the critical values that they just told them so that they have a record that they have indeed been told so they can take action on them. And just because the technician could not recall in a deposition two years later exactly what the critical values was, does not mean that we did not raise a fact issue as to whether Green actually knew these. I'm sorry. All right, Mr. Thomas, thank you. We have your argument. The case is submitted and the court will stand and recess until one o'clock tomorrow afternoon.